IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>WESTERN DIVISION</u>

ISREAL RUSSELL,                                          )
                                                         )
                    Plaintiff,                           )
                                                         )
v.                                                       ) CIVIL ACTION NO. 05-PWG-0372-W
                                                         )
CITY OF TUSCALOOSA, ET AL.,                              )
                                                         )
                    Defendants.                          )

<u>MEMORANDUM OF OPINION</u>

Plaintiff Isreal Russell, an African American male, filed this action against defendants City of Tuscaloosa ("the City") and Civil Service Board of the City of Tuscaloosa ("the Board") alleging that he was denied selection to the position of Maintenance Crew Supervisor in February of 2003 by the City and the Board because of his race and age.  Mr. Russell further contends that he was retaliated against by the City for filing an EEOC charge all in violation of the Title VII, the Age Discrimination in Employment Act (ADEA), 42 U.S.C. §  1983, and  42 U.S.C. § 1985.  Russell seeks injunctive relief, back pay, punitive and compensatory damages.  The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.

This case is before the court on the Motion for Summary Judgment filed by the Board (Doc. # 47) and the Motion for Summary Judgment filed by the City (doc. # 48).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Rule 56, *Federal Rules of Civil Procedure*.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

## BACKGROUND AND MATERIAL UNDISPUTED FACTS

The following pertinent facts are undisputed or, if disputed, viewed in the light most favorable to Russell, as the nonmoving party.

In 1947, the Alabama legislature withdrew from the City of Tuscaloosa the power to make certain employment decisions regarding most of the City's salaried employees and gave that power to "The Civil Service Board of Tuscaloosa," an independent three-person board whose members are appointed by the Governor of the State of Alabama. (1947 Ala. Acts 249, pp. 54, 174-181; Def.'s Exhibit 6; Russell Dep., 192, 225; Gibson Affidavit). "Maintenance Crew Supervisor," the position sought by the Russell, was within the class of positions covered by the Act. (Complaint, ¶ 20; Russell Dep., 182, 191-192); therefore, the Board had the exclusive authority to decide who would fill the position. (1947 Ala. Acts 249, 58; Complaint, ¶ 20; Gibson Affidavit).

The Maintenance Crew Supervisor position, which is in the City's Department of Transportation ("TDOT"), consists of several functions and responsibilities, including supervisory/management/administrative tasks relating to a maintenance crew engaged in the performance of work orders relating to street cleaning, as well as occasional equipment operation. (Russell Dep., 17, 53-54,84,150-154,156-158,160,164; Robinson Affidavit; Gibson Affidavit). One of the supervisory/management/administrative tasks performed by the Maintenance Crew Supervisor requires the use of a computer to input employee time, attendance data as well as to retrieve and input data regarding the work orders logging the completion of work orders. (Russell Dep., 17,84, 97-98,232; Robinson Affidavit; Gibson Affidavit). Neither Robinson nor Howell knew the amount of time the Maintenance Crew Supervisor was required to spend using the computer. (Robinson Dep., 23,24 and 53; Howell Dep., 19.)

Verner Thomas held the Maintenance Crew Supervisor position sought by the Plaintiff until his resignation on December 30, 2002.  Russell was a member of Thomas's maintenance crew. (Russell Dep., 25; Robinson Affidavit).  On November 26, 1997, at the direction of his supervisors,

Thomas, an African American male, reprimanded Russell for repeatedly complaining about being instructed to operate a street sweeper machine after being instructed to do so without complaining. (Russell Dep., 69-71,166-175,458-464 and Exhibit 2 thereto; Thomas Decl.)

After Thomas resigned, several employees submitted applications to the Board seeking to replace him, including Russell; Andy Banks, a white male; Malcolm Storey, an African American male; Gerald Pritchett, a white male; David McDaniel, a white male; Glenn Clements, a white male; and Craig Thorpe, a white male. (Russell Dep., 197-198, 205-206, 210-213; Robinson Affidavit).

Under Section 8 of the Civil Service Act, the head of a department is required to make the Civil Service Board aware of his recommendation regarding a civil service position within his department; however, the recommendation is not binding on the Board. (Gibson Affidavit). In accord with this requirement, TDOT scheduled interviews of the applicants. (Robinson Affidavit; Russell Dep., 192,225).

Russell was interviewed for the position by Jon Howell, a white male Traffic Systems Manager within TDOT, and Sedell Bullard, an African American male employed in the City's Human Resources Department. (Russell Dep., 45, 213-214; Robinson Dep., 46; Robinson Affidavit). Russell testified in deposition that he had no evidence that the interviewers harbored or were motivated by any race or age-related animus towards him. (Russell Dep., 8,220- 222, 232).

On February 7, 2003, Howell sent a memorandum to the department head, Joe Robinson stating:

> Sedell Bullard and myself interviewed eight candidates for the job of Labor Crew Supervisor. All eight candidates are currently TDOT employees. The following are the candidates:

4

> Andy Banks – Andy has been employed by the City of Tuscaloosa for
> 10 years.  He is currently an Inspector with the Engineering Division
> of TDOT.  I feel Andy would be a very good supervisor for this crew.
> The only issue with Andy is he has not been involved with this crew,
> but I feel he can adapt to this crews['] duties and carry out what is
> expected of a crew and supervisor at TDOT.
>
> Israel Russell – Israel is probably the most qualified for this position.
> He has been with the city for 16 years.  All of which have been on
> this crew.   However, Israel has been reluctant to work with
> computers.  He currently cannot access time in the CATTS system or
> retrieve orders from CCAR.  This is a major obstacle in achieving
> what is expected form [sic] our foreman at TDOT.
>
> Ross Carver – Ross has been employed by the city for 16 years as a
> mechanic.  Ross has no supervisory experience except for filling in
> when his foreman is off.
>
> Gerald Pritchett – Gerald has been employed by the city for 33 years.
> He is currently in the Transportation Maintenance Division of TDOT.
> I feel Gerald merits consideration for this position.
>
> There were four other applicants for this position.  (Malcolm Storey,
> David McDaniel, Miguel Sledge, Glen Clements) I do not feel these
> four warranted further consideration.

(Russell Dep., exhibit 8; Plaintiff's exhibit 8).  There is no evidence, however, that the  Board

received or considered this memorandum before making its decision. (Gibson Affidavit).

Based on Howell's recommendation, (Robinson Dep., 44) Robinson recommended to the

Board by memorandum dated February 10, 2003 that Russell, Banks, and two other applicants be

considered for the position:

> Sedell Bullard and Jon Howell interviewed eight candidates for the
> above position. From the eight, Mr. Bullard and Mr. Howell have
> recommended I consider the following four (4).
>
> Mr. Andy Banks has been an employee of TDOT for 10 years. He is
> currently an Inspector in the Engineering Division. Mr. Banks has
> done well in directing the work of others in his current job. I feel he

5

> can adapt to this crew and carryout whatever is expected of a
> foreman.
>
> Mr. Isreal Russell has been the acting foreman of this crew since the
> foreman became ill. He has been a City employee for 16 years with
> this same crew. His only problem is his reluctance to use computers
> to carry out such items as filling out crew time reports and citizen
> orders.
>
> Mr. Ross Carver is a mechanic in the Fleet Maintenance Section. Mr.
> Carver has worked for the City for 16 years.
>
> Mr. Gerald Pritchett is a 33 year employee of the City that currently
> works in the Transportation Maintenance Section of TDOT.

(Robinson Affidavit, exhibit 1).

Russell, who had been an equipment operator, told Howell that he knew how to enter orders

into the computer system.  (Russell Dep., 89; Russell Decl.).  Russell testified that he had no class-

room training or formal education in the use of computers.  He had never used a computer before,

however, he spent two lunch hours with the ladies in the office at TDOT to learn how to close out

orders.  (Russell Dep, 12-16, 93).  After the two training sessions, he spent a total of approximately

20 minutes using the computer to enter work order information.  (Russell Dep, 113-114).  Howell

knew that Russell could not access the time and could not retrieve orders in the City's computer

systems.  (Russell Dep, 232).

Although Russell was one of three persons who filled in for Verner Thomas during Thomas's

absences (Russell Dep., 71-74, 80-84, 107, 109, 116-118, 242; Russell Decl; Thomas Decl.), he did

not perform the computer-related functions of the Maintenance Crew Supervisor position during

those periods (Russell Dep., 17, 106-107, 115, 132, 157, 242).  In his application submitted to the

Board, Russell listed the specific equipment he could operate but made no mention of supervisory

experience or computer skills (Russell Dep., 191-197, 232 and Exhibit 5 thereto).  The application form contains a "Skills & Certifications" section which states: "List any and all skills, abilities, special certifications, licenses, special training, or course you have had that you feel are applicable to the position for which you have applied.  Include skills with computer, software, other equipment or machines you operate."  Andy Banks identified "computer skills, overseeing contractors, mechanic skills, public relation skills, and operate heavy equipment" as his skills.  (Banks' Application, Pl.'s Ex. 4).

Based on Russell's application, the Board concluded that Russell had no computer skills. (Gibson Affidavit).  Andy Banks, the successful applicant, had computer skills and also supervisory experience by virtue of having served as an Engineering Inspector. (Robinson Affidavit; Gibson Affidavit).  There is no evidence that Banks' ability to operate computer programs specific to the City was revealed in the interviews.  Howell could not recall what questions were asked in the interview. (Exhibit 4; Howell Dep., 37).

The Board considered the applications of each applicant and the Robinson memorandum in an independent review at its meeting on February 19, 2003.  After discussing the relative qualifications of the applicants, the Board concluded that Banks was more qualified than Russell to fill the position of Maintenance Crew Supervisor based on his computer skills and supervisory experience gained while serving in positions such as Engineering Inspector, which the Board deemed the most important qualifications for this position (Gibson Affidavit; Russell Dep., 186,192,225). While Turner, one of three members of the Board,  could not recall the date he reviewed Russell's application or the amount of time spent reviewing it, he testified "we took whatever time was necessary to discuss and review every application."  (Turner Dep., 29).

The Board would have made the same decision to hire Banks rather than Russell even if it had not received the Robinson memo. (Gibson Affidavit). The decision to select Banks was made by the Board, not the City. (Gibson Affidavit).

Following notice of the Board's decision on February 02,2003, the Russell did not contact the Board. (Russell Dep., 261, 263, 291, 309-310). When he heard Banks had been selected for the Maintenance Crew Supervisor position, Mr. Russell was very upset and wanted Banks removed from the position so that he could replace him. (Russell Dep., 265,276-277). Russell filed grievances with the City on February 26, 2003, March 7, 2003, and March 19, 2003 challenging the decision, but was consistently informed by the City that the Board, and not the City, had made the decision. (Russell Dep., 277,285,288,290-300,302-305,308-309,319).

On May 5, 2003, Russell filed an EEOC charge against the Board. On March 31, 2004, the Equal Employment Opportunity Commission issued a determination concluding that the City discriminated against Russell based on race and age when Russell was not promoted to Maintenance Crew Supervisor. The determination states in pertinent part:

> Charging Party alleges that he was not promoted to Maintenance Crew Supervisor, a position for which he applied and was qualified, because of his age, 51, and race, Black. He further alleges that the applicant selected was less qualified than he, younger, and White.
>
> I have determined that Respondent discriminated against the Charging Party with respect to promotion in violation of Title VII and the ADEA. The evidence gathered during this investigation establishes that the applicant selected for the promotion is a younger individual, is White, and did not meet the minimum qualifications posted for the position. Evidence does not support that the selectee possessed the licenses or supervisory experience required by that posting. The computer skill which the Respondent cites as a reason for not promoting the Charging Party is not an essential function in the posting and evidence indicates that the selectee learned to enter

> work order and time and attendance information after receiving the promotion. Evidence further shows that management of the department who recommended the Respondent's selection was aware of the Charging Party's qualifications and had allowed only the Charging Party to perform the Supervisor's job in his absence for several years. The respondent did not offer a legitimate nondiscriminatory reason for failing to promote the Charging Party.

(Plaintiff's Exhibit 1).

Russell informed Banks that he was more qualified than Banks. Banks learned that Russell was instituting legal action to challenge the decision. Mr. Russell never told Banks and Banks was never aware that Russell had filed an EEOC charge or that Russell had asserted a claim based on race or age discrimination. (Russell Dep., 303,347-349,369-371,391-393; Banks Affidavit). In his deposition, Russell testified that he did not remember Banks using the word "grievance" or "EEOC charge" around him. (Russell Dep., 349). In his declaration, however, Russell states:

> After I filed a grievance with the City of Tuscaloosa ("City") regarding not being chosen for the position of Maintenance Crew Supervisor, Andy Banks stated to me that he did not know "why ya'll would file a grievance when ya'll know you will not win." I got the impression that he was referring to African Americans.

> Andy Banks, knew at a minimum, that I had filed a grievance with the City of Tuscaloosa regarding not being chosen for the position of Maintenance Crew Supervisor.

(Russell Decl.**).**

Based on what Russell told him, Banks surmised that Russell had instituted a lawsuit against the city under the Act seeking to oust Banks on the grounds that Russell was more qualified. (Banks Affidavit).

On May 5,2003, Russell filed a charge of discrimination with the EEOC claiming that the failure to select him for the position of maintenance crew supervisor was due to his race and age.

(Russell Dep., 347,352, and Exhibit 18 thereto). Russell received a pay increase on June 28,2003. (Russell Dep., 350-353). On August 6, 2003, he received a written reprimand. (Russell Dep., 391). He was suspended in April, 2004. (Russell Dep., 412).

After Banks received the supervisor position, Russell physically avoided him.  Russell testified that he would on occasion simply ride around in a City truck during working hours. (Russell Dep., 248-249, 319, 376). Russell questioned or challenged Banks's instructions to his face.  He also talked behind his back to members of the crew, telling the crew that Banks did not know his job and was not qualified.  (Russell Dep., 312-314,320,324,341,354-358,361,386-388,405-408,456,459,464, 466).  When Banks instructed him to operate a street sweeper, one of the pieces of equipment within his job description as Equipment Operator Senior (Banks' Affidavit), Russell refused to do it and challenged Banks's authority to instruct him to do so.[1]  (Russell Dep., 456).

On August 6, 2003, Banks gave Russell a written reprimand which stated:

> You are being issued a written reprimand for being insubordinate to your immediate supervisor on several occasions; you have been verbally warned about the practice of harassing me about your pending suit with the City of Tuscaloosa.  With this reprimand, You are directed to stop this practice or face further discipline.

(Russell Dep., 374-375,391-392,394-397 and Exhibit 20 thereto; Banks Affidavit).  The reprimand had no financial or other tangible effect on the Russell.  (Russell Dep., 395-396).    After the

---

[1]    In his deposition, Russell testified that he preferred to operate only a street water flusher truck but admitted that as an Equipment Operator Senior, he had no right to refuse an order by a supervisor to operate any piece of equipment used by the maintenance crew. (Russell Dep., 70). However, according to Russell, "I am getting older" and "looking out for my future," and operating a flusher truck "ain't nothing but a piece of cake." All it involves is following a sweeper truck which "go very slow" and this allows the flusher truck operator to listen to music on the radio. (Russell Dep., 102-105,138,143-144,148-149,566). "[T]hat's why I wanted the truck, but they took me out of it." (Russell Dep., 103). Conversely, before applying for the Maintenance Crew Supervisor position which he testified was difficult and stressful (Russell Dep., 164), Russell had told Sedell Bullard in the Human Resources Department and Jon Howell in TDOT that he did not want the position. (Russell Dep., 94-95,100-101,216).

10

reprimand, Banks learned that Russell "had disguised his taunts about my removal through the use

of code words such as 'all rise' which I interpreted to refer to a lawsuit to remove me." (Banks'

Affidavit).   Russell testified in deposition that he had not used the phrase "all rise" after Banks

became his supervisor.   (Russell Dep, 413).   He also testified in deposition that he had used the

phrase but not in Banks's presence.     (Russell Dep., 413-414,418-419).   In his answers to

interrogatories, Russell stated:

> Plaintiff has been retaliated against twice by Defendant, City of
> Tuscaloosa. First, Plaintiff was suspended for three days without pay
> in June 2004 for the stated reason of insubordination. Plaintiff was in
> the break room playing dominos and stated "all rise." Banks
> misinterpreted this statement ....

(Russell Dep., Exhibit 22, p.16 (Answers to City's Interrogatory 11)).   Based on the "all rise"

comments, Banks decided that the Russell should be suspended for three days, (Russell Dep., 364,

412,424-427,470-471,475-478,486-487 and Exhibit 21 thereto).   Banks's decision to suspend Russell

was approved by TDOT Traffic Engineer David Griffin and communicated to Russell on April 9,

2004. (Griffin Affidavit).   The memorandum informing Russell of his three day suspension states:

> You are being issued a 3-day suspension for continuing to make
> harassing comments to me or in my presence about the pending suit
> you have against the City of Tuscaloosa.   You have already been
> verbally warned and also have a written reprimand for the same
> offense.   This type of behavior is unacceptable and creates a hostile
> work environment for your co-workers and undermines the chain of
> command.
>
> Your suspension will be effective Monday April 12, 2004 through
> Wednesday April 14, 2004.   You may return to work on Thursday
> April 15, 2004.   With this 3 day suspension, you are directed to stop
> this practice or face further disciplinary action up to termination.

(Banks' Affidavit, exhibit B).

11

Russell filed his second EEOC charge on April 27,2004, alleging retaliation. (Russell Dep., 33-34,489-490 and Exhibit 24 thereto).

On November 15,2004 Joe Robinson reassigned Russell from Banks's crew because of insubordination (Russell Dep., 501-503,509-515; Robinson Affidavit) based on Russell's refusal to provide Banks with a statement regarding an accident in which a  a sweeper machine worth $180,000 operated by crew member Maurice Curtis was destroyed. (Russell Dep., 377, 379-383,499, 502, 505; Robinson Affidavit).  Following the accident, TDOT Department Head Robinson asked Banks to obtain statements regarding the accident from crew  members, including Russell. (Russell Dep., 504-505; Robinson Affidavit; Banks Affidavit).  On two occasions Banks asked Russell  to submit a statement regarding the accident and the Russell failed and refused to do so. (Russell Dep., 377-386,502-508).  Russell testified as follows:

"Q.    Okay.

A.    And he told me I was going to write the letter before I go home.

Q.    And you just left?

A.    I just left.

Q.    Didn't do what he told you to do?

A.    No, I didn't write no letter."

(Russell Dep., 379-380).

Russell maintains that he did not see the accident and told Banks this (Russell Decl.).  Russell argues that his refusal to submit a statement could not amount to insubordination.

Russell did not file an EEOC charge regarding his reassignment. (Russell Dep., 515).  The reassignment to the "asphalt" crew involved no change in Russell's compensation or job

12

classification. (Russell Dep., 27,517-519,531; Robinson Affidavit).    Although Robinson characterized the move as a lateral one, Russell denies that the move was a lateral move citing generally to his declaration in which he states only that the asphalt crew was composed entirely of African Americans and that it "is the least desirable crew within TDOT."  (Russell decl.).

I.      Discriminatory failure to promote

Russell asserts claims against the City and the Board  under Title VII, the ADEA, § 1983, and § 1985 for failing to select him for the position of Maintenance Crew Supervisor.

Under Title VII, it is unlawful for an employer to discriminate against an individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2003-2. The ADEA prohibits an employer from discriminating on the basis of age. 29 U.S.C. § 623(a). The law developed in Title VII, ADEA, and § 1983 are applied interchangeably. See *Pennington v. City of Huntsville,* 261 F.3d 1262, 1269 (11th Cir.2001) ("Moreover, we typically apply legal standards developed in Title VII and ADEA cases interchangeably."); *Underwood v. Perry County Com'n,*  431 F.3d 788, 793 (11th 2005)(the elements of Title VII and § 1983 as a parallel remedy are the same).

The Board argues that it escapes liability under Title VII and the ADEA because it is not an employer because it does not have fifteen employees and is not responsible for compensation.  The Board does not argue that it escapes liability under § 1983.  "When section 1983 is used as a parallel remedy for violation ... of Title VII , the elements of the two causes of action are the same," *Underwood v. Perry County Com'n,*  431 F.3d 788, 793 (11th 2005) quoting *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir.1982) (citing *Whiting v. Jackson State Univ.,* 616 F.2d 116, 123 (5th Cir.1980)).  Inasmuch as the analysis is the same under § 1983, Title VII, and the ADEA, the court will address the merits of the failure to promote claim.

A plaintiff may prove a claim of discrimination through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). "[D]irect evidence is 'evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.' " *Akouri v. State of Fla. Dep't of Transp.,* 408 F.3d 1338, 1347 (11th Cir.2005) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.,* 125 F.3d 1390, 1393 (11th Cir.1997)). "An example of direct evidence would be a management memorandum saying, Fire [Defendant]-he is too old." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358-59 (11th Cir.1999) (direct evidence "must indicate that the complained-of employment decision was *motivated* by the decision-maker's ageism") (emphasis in original).

A.   *Prima Facie* case

When the plaintiff relies upon circumstantial evidence to establish his claim, as here, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff may establish a *prima facie* case of promotion discrimination by showing that: (1) he is a member of a protected minority; (2) he was qualified and applied for the promotion; (3) he was rejected despite these qualifications; and (4) the position was filled by someone outside the protected minority. *Vessels v. Atlanta Independent School System,* 408 F.3d 763, 768 (11th Cir. 2005); *Walker v. Mortham,* 158 F.3d 1177, 1185-87 (11th Cir.1998). To demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he satisfied an employer's objective qualifications. *Vessels,* 408 F.3d at 769. A plaintiff is not required to prove as part of his *prima facie* case that he is more qualified than the successful applicant. *Walker*, 158 F.3d at 1189, relying on *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). As an African American, Russell is a member of a

14

protected minority; he was qualified for the position for which he applied as evident by the fact that he was included in the list of names to be considered for the position; he was not selected; a younger white male was selected for the position.   Russell has established a *prima facie* case of discrimination.

> B.   Legitimate, nondiscriminatory reason

Once a *prima facie* case is established, the burden then shifts to the employer to state a legitimate, nondiscriminatory reason for the employee's rejection. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). An employer's burden to articulate a non-discriminatory reason for failing to promote an employee is a burden of production, not of persuasion. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). Because this burden involves no credibility determination,  *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993), it is an "exceedingly light" burden.  *Perryman v. Johnson Prod. Co.,* 698 F.2d 1138, 1141 (11th Cir.1983). The employer must simply articulate "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Burdine,* 450 U.S. at 254-55, 101 S.Ct. at 1096.

The Board has articulated a legitimate, non-discriminatory reason for its decision. Specifically, the Board states that Banks was more qualified than Russell.  Banks's application reflected that he possessed critically important computer skills and Russell's application did not.

The inability of Turner, one of the three Board members, to remember the specifics of the review for the maintenance crew supervisor position and relevant applications is inconsequential – certainly not reason to persuade the court that the Board failed to discharge its burden of production.

*Vessels ,* 408 F.3d at 769.  Turner testified as to the Board's practice in reviewing applications.

Further, the other two board members testified as to their reasons for choosing Banks over Russell.

### C.      Pretext for discrimination

After the employer discharges its burden,  the burden shifts back to the plaintiff to show that

the reason offered by the employer was a pretext for discrimination. *McDonnell Douglas Corp.,* 411

U.S. at 804, 93 S.Ct. at 1825.  "[W]here an employee seeks to prove pretext through qualifications

alone, the difference in qualifications must be so glaring that no reasonable impartial person could

have chosen the candidate selected for the promotion in question over the plaintiff.  However, where

the qualifications disparity is not the *sole* basis for arguing pretext, the disparity need not be so

dramatic to support an inference of pretext." *Vessels,* 408 F.3d at 772 (emphasis in original, citations

omitted).  At the pretext stage, the court's concern is not whether the employment decisions are

prudent or fair but whether unlawful discriminatory animus motivates the challenged employment

decision.  *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999).  To

survive summary judgment, the employee must come forward with evidence sufficient to permit a

reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true

reasons, but were a pretext for discrimination. *Id.; see also, Chapman v. AI Transport*, 229 F.3d

1012, 1024 (11th Cir. 2000).  This evidence must reveal "such weaknesses, implausibilities,

inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for

its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern

Co.,* 390 F.3d 695, 725 (11th Cir.2004).

Russell argues that "[t]he EEOC's findings, at the very least, raise a factual dispute as to

whether the reasons offered by the City to not select Russell for the Maintenance Crew Supervisor

position are pretextual."  (Doc. #50, p. 27).   While the EEOC determination was admissible, *Barfield v. Orange County,* 911 F.2d 644, 649 (11th Cir.1990), the court is  not required to defer or make reference to the EEOC determination nor is it required to address EEOC findings; rather, the court must conduct a *de novo* review of the claims. *Moore v. Devine,* 767 F.2d 1541, 1549-51 (11th Cir.1985), *modified on reh'g,* 780 F.2d 1559, 1560 (11th Cir.1986) (clarifying that EEOC determinations for federal employees are different and may be binding on the courts).

The March 31, 2004 EEOC determination concluded that the City of Tuscaloosa discriminated against Russell with respect to promotion in violation of Title VII and the ADEA.  The determination did not, however, describe the specific evidence relied upon in reaching its conclusion; therefore, this court rejects Russell's contention that the EEOC determination raised a genuine issue of material fact regarding his claims of discrimination.  *Kincaid v. Board of Trustees*, 188 Fed.Appx. 810, 817, 2006 WL 1746885 (11th Cir. 2006).

The application clearly stated that applicants should list skills and certifications:

> List any and all skills, abilities, special certifications, licenses, special training, or courses you have had that you feel are applicable for the position for which you have applied.  Include skills with computer, software, other equipment or machines you operate.

(Plaintiff's exhibits 3 and 4).

Russell listed "sweeper, street flusher, back hoe, road grader, high lift truck, ditch switch, front end loader, most all of city owned equipment." (Plaintiff's exhibit 3)  Banks listed "computer skills, overseeing contractors, mechanic skills, public relation skills, operate heavy equipment." (Plaintiff's exhibit 4).

Russell does not argue that he possessed superior computer skills to Banks.  Instead, he argues that there is a genuine issue of material fact as to the truth or falsity of the  reason provided by the Board for its decision to hire Banks over Russell – Banks was more qualified than Russell by virtue of the fact the Banks's application reflected that he possessed critically important computer skills and Russell's application did not.  Russell's argument is based on the fact that the Board has previously represented that Banks possessed superior computer skills including the ability to enter work orders and time and attendance records and that computer skills were the most important skill for the maintenance supervisor position.  He argues that while Banks's application listed "computer skills," the application did not indicate Banks's ability to operate the software the City uses to enter work orders and time and attendance records.  Russell misconstrues or misrepresents the Board's actual assertions in the documents he has cited.  In the July 10, 2003 EEOC charge, the Board stated in pertinent part:

> As indicated by the enclosed "classification specification," the Maintenance Crew Supervisor position involves the supervision of work crews "primarily engaged in maintenance and repair assignments" and "installation and fabrication projects." The projects potentially encountered range from cleaning curbs and gutters to installation and repair of roads, as well as utilities such as sewer and water.  It also specifically involves the inspection of work sites as well as the inspection of work "to ensure standards are met."  In addition, the supervisor "prepares and/or receives forms, reports, work orders, or documentation; completes, processes, forwards, and maintains records." This includes employee records such as time and attendance.  **This function (especially time and attendance and work orders) is performed on a Dell computer which utilizes "Windows" based and "Office 2000" software and therefore requires someone with computer skills.**
>
> As indicated by his enclosed application, Andy Banks had worked as an Engineering Inspector for almost <u>two years</u>.  In this job, which like the Maintenance Crew Supervisor position is in the City's

Department of Transportation, Banks supervised and inspected substantially similar construction activities. (See enclosed "Classification specifications for the position of Engineering Inspector.") **In addition, he used a Dell Computer which also utilized "Windows" based and "Office 2000" software. You will notice that his application affirmatively reflects that he had computer skills.** Contrary to the Charging Party's conclusory allegations, Banks also satisfied the minimum qualifications of the Maintenance Crew Supervisor position. Each of his prior jobs within the Department of Transportation required the operation of equipment.

(Plaintiff's exhibit 12, p. 2-3) (emphasis added). The Board did not represent that Banks had experience entering work orders and time and attendance records, only that he had used a Dell computer which utilized Windows based Office 2000 software in conjunction with his previous position with the TDOT. Turner testified in deposition that the ability to communicate was the most important qualification for a maintenance crew supervisor and that communication included the ability to communicate with supervisors, both by computer and in person. (Turner Dep., 25-27). He testified that the communication skills would be measured by the applicant's application. (Turner Dep., 27). Robinson testified that Banks was better qualified because "he had the essential computer skills that was needed." (Robinson Dep., 60). Howell testified that in his opinion the most important qualification of a maintenance crew supervisor was to be able to enter time into the computer in order that employees were paid and work orders properly tracked. (Howell Dep., 19). These representations are not at odds with the Board's asserted reason for the selection of Banks because he indicated on his application that he had computer skills. As between Banks who indicated he had computer skills and Russell who did not indicate that he had computer skills (even though the application clearly encouraged applicants to list computer skills if possessed), it was certainly reasonable for the Board to conclude that Banks would be able to learn specific new computer tasks

19

and to use software with greater ease than someone with no computer skills. Russell has not submitted evidence such that a reasonable factfinder could find the Board's proffered legitimate reason for its action to be unworthy of credence. Russell has failed to show that the articulated reasons for not promoting him – that Banks was better qualified based on his computer skills and supervisory experience – were a pretext for discrimination. An employer could reasonably conclude that Banks was more qualified for the maintenance crew supervisor position.

The City argues, and Russell concedes, that the City can only be liable for his non-selection upon a showing that (i) the City was motivated by discriminatory animus regarding the personnel decision in question, (ii) that the City actually made the decision not to select the applicant because of that animus, and (iii) the Board was a mere "conduit" for the City's discriminatory motive, and simply rubber stamped that decision. *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999), cert. denied, 529 U.S. 1053 (2000); *Quinn v. Monroe County*, 330 F.3d 1320 (11th Cir. 2003). Russell argues that he can raise a genuine issue of fact with respect to each of these elements.

Russell states that Robinson showed an unspoken preference for Banks by listing him as the first applicant and stating that he "can adapt to this crew and carry out whatever is expected of a foreman" while stating the Russell has a problem with his "reluctance to use computers to carry out such items as filling out crew time reports and citizen orders." Russell questions how Robinson could have reached this conclusion about him [Russell] when there is no evidence that Robinson reviewed the applications and Howell specifically  stated in his memorandum that Russell "is probably the most qualified for this position." Howell's statement concerning Russell was tempered by Howell's observation that "Israel has been reluctant to work with computers. He currently cannot access time in the CATTS system or retrieve orders from CCAR. This is a <u>major obstacle</u> in

20

achieving what is expected f[ro]m our forem[e]n at TDOT." (Plaintiff's exhibit 8) (emphasis added).

Russell further argues that although the Board claims that they only reviewed the applications to determine who should be hired for the position, there is no evidence that Banks possessed the important computer skills of entering work orders and time and attendance records. As between Banks and Russell, Banks listed computer skills. Russell did not. Banks's application also reflected that he had been an engineering inspector for almost two years and his duties included overseeing contractors and inspecting the work they perform for the city. Clearly Banks had supervisory experience. Although Robinson believed that Banks was better qualified than Russell, he recommended to the Board that Banks, Russell and two others be considered for the supervisor position. It was certainly within his authority to recommend only Banks for the position. By recommending all four applicants, the Board was able to independently review the applications of the four recommended applicants, including the application of Russell. Robinson stated in his affidavit that the Board had on several occasions selected applicants other than those recommended by Robinson and that the Board did not consult him before selecting Banks. Russell has not shown that the City was motivated by discriminatory animus nor that the City decided not select Russell (in fact, the City actually listed Russell among those candidates being recommended). Finally, Russell did not show that the Board was a conduit for any alleged discriminatory motive by the City and merely rubber-stamped the City's decision.

II.     Section 1985 claim

The Board argues that the § 1985 claim is due to be dismissed because § 1985 may not be invoked to redress violations of Title VII, citing *Great American Federal Savings & Loan*

21

*Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). In *Dickerson v.*

*Alachua County Com'n,* 200 F.3d 761, 766 -767 (11th Cir.2000), the Eleventh Circuit held:

> [A]lthough Dickerson's Title VII and § 1985(3) claims arise out of the same underlying facts, the rights which are the basis of the § 1985(3) claim are rights created by the Constitution, not by Title VII. Indeed, Dickerson's § 1985(3) claim is based on the Fourteenth Amendment rights to equal protection of the laws and due process. Because this case involves the assertion of constitutional rights, the holding of *Novotny* simply does not apply here. ...Dickerson's § 1985(3) claim is not preempted by Title VII.

The elements of a cause of action under § 1985(3) are "(1) a conspiracy; (2) for the purpose

of depriving, either directly or indirectly, any person or class of persons of the equal protection of

the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the

conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right

or privilege of a citizen of the United States." *Denney v. City of Albany,* 247 F.3d 1172, 1190 (11th

Cir. 2001) quoting, *Lucero v. Operation Rescue,* 954 F.2d 624, 627 (11th Cir.1992) (citing *United*

*Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott,* 463 U.S. 825, 828-29, 103

S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983)).

In support of his allegation that the City and Board conspired to discriminate against him in

the selection process, Russell argues that the  consistency of the statements by the Board and City

"smell of conspiracy."  He argues that both the Board and City claim computer skills were the most

important skill for a maintenance crew supervisor but could not state what percentage of time a

supervisor would spend on the computer.  He appears to further argue that because Banks lists

computer skills on his application and because the Board and City wanted to place Banks in the

position, they agreed that "computer skills" was the most important skill for a maintenance crew

supervisor even though there was no evidence that Banks could operate the software.  To the extent that a § 1985 claim could be stated, Russell has failed to do so with his vague, conclusory ad general allegations of conspiracy.  *Fullman v. Graddick,* 739 F.2d 553, 557 (11th Cir.1984).

To state a claim of conspiracy under § 1985 one must allege that "the conspirators were motivated by ... racial, or otherwise class-based, invidiously discriminatory intent." *Kearson v. Southern Bell Tel. & Tel. Co.,* 763 F.2d 405, 407 (11th Cir.1985), quoting, *Almon v. Sandlin,* 603 F.2d 503, 505 (5th Cir.1979).   Although Russell is African American, he does not set out any facts to suggest that any alleged preference for Banks over Russell was a product of racial or otherwise class-based animus.

III.    Retaliation claim

Russell argues that the City retaliated against him for filing an EEOC complaint.[2]   As evidence of this retaliation, he points to his reassignment, his three day suspension for insubordination, and his written reprimand.

Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

To establish a *prima facie* case of retaliation under Title VII and the ADEA, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir.2006); *Weeks v. Harden Mfg. Corp.,*

---

[2]    Russell does not present a retaliation claim against the Board.

291 F.3d 1307, 1311 (11th Cir.2002); *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000).

In *Burlington Northern & Santa Fe Railway Co.*, __ U.S. __, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court held that "the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" and therefore "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-14. Rather than being required to show an adverse employment action, a plaintiff must now show only that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (internal citations omitted..)

If the plaintiff establishes a *prima facie* case, the burden "shifts to the defendant to articulate a legitimate reason for the adverse action." *Hurlbert*, 439 F.3d at 1297. "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

The City argues that the grievances alleging discrimination and the EEOC complaints alleging discrimination and retaliation were not protected activity because Russell presented no evidence that the failure to promote was motivated by discriminatory animus and no evidence that the suspension was motivated by retaliatory animus. The City argues that based on the lack of evidence he had no reasonable, good faith belief that he had been a victim of discrimination or retaliation. "To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to [his] protest, so long as [he] had a reasonable good faith belief that the discrimination existed." *Gupta,* 212 F.3d at 586. Even assuming, without deciding, that the

grievances and EEOC complaints were protected activity, the City is entitled to summary judgment for the reasons expressed below.

      A.     <u>Retaliatory reassignment</u>

          1.     <u>Reassignment claim is barred</u>

The City argues that the retaliatory reassignment claim is barred because Russell did not file an EEOC charge regarding the reassignment. Russell did not respond to this argument. Prior to filing a Title VII action, a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC. *Gregory v. Ga. Dep't of Human Res.,* 355 F.3d 1277, 1279 (11th Cir.2004) (per curiam). A plaintiff's judicial complaint is limited by the scope of the EEOC investigation that "can reasonably be expected to grow out of the charge of discrimination." *Gregory,* 355 F.3d at 1280. However, "the scope of an EEOC complaint should not be strictly interpreted." *Id.* The second (and relevant) EEOC charge alleged that Russell's suspension was retaliatory. (Russell dep., pp. 489-90). A retaliation claim based on reassignment which occurred six months after the filing of the second EEOC claim could not have reasonably been expected to grow of the allegations made by Russell in his second EEOC charge (nor out of the first EEOC charge a year and a half earlier concerning the failure to promote). The retaliation claim based on Russell's reassignment is barred.

          2.     <u>No *prima facie* retaliation case based on Russell's reassignment</u>

Russell cannot establish a *prima facie* case of retaliation based on his reassignment. Russell has not carried his burden of establishing that his reassignment was a materially adverse action. Russell was transferred from the maintenance crew of the transportation department where he drove a flusher truck to the asphalt crew where he drove an asphalt truck. His job classification and pay

remained the same.  In his declaration, Russell states that the asphalt crew was comprised entirely of African Americans and is "the least desirable crew within TDOT. " (Russell Decl.).  Russell does not point to any deposition testimony or documentary evidence to support his statement that the asphalt crew was comprised entirely of African Americans.  He also does not state in his affidavit why the crew was considered the least desirable crew.   Quoting *Burlington*, Russell argues that he was placed in a job that was "by all accounts more arduous and dirtier."  He further argues that by reassigning Russell, "the City segregated Russell to work solely with persons of his own race and sent the message that they would put him in his place."  (Doc. # 50, p. 33).   Russell does not point to deposition testimony or other evidence indicating how his duties on the asphalt crew differed from his duties on the maintenance crew nor how the work Russell was required to perform after his transfer was "more arduous and dirtier."  The argument in Russell's brief that the City was sending him a message that they would put him in his place by placing him on a crew comprised entirely of African Americans appears to be mere rhetoric.  Russell does not point to any testimony that he perceived the City to be sending him a message.  Moreover, had Russell testified to that effect, the inference is merely a subjective one drawn by Russell rather than an objective inference required by *Burlington*.

Also assuming that the reassignment or transfer was a materially adverse employment action, Russell has failed to establish the necessary causal connection.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct [and] that the protected activity and the adverse employment action were not wholly unrelated." *Gupta,* 212 F.3d at 590 (internal quotations and citation omitted).  Temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision-

maker did not have knowledge that the employee engaged in protected conduct. *Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 799 (11th Cir.2000).  While Robinson, the decision maker with respect to the reassignment presumably knew Russell had filed the second EEOC complaint approximately six months prior to his reassignment (as well as the first EEOC complaint a year and a half earlier, this proximity is insufficient to create a genuine issue of fact as to causal connection. *Clark County Sch. District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001)(three to four months is insufficient to show causal connection); *Wascura v. City of South Miami,* 257 F.3d 1238, 1248 (11th Cir.2001)(in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation); *see also*, *Drago v. Jenne,* 453 F.3d 1301, 1307 -1308 (11th Cir. 2006)("We are not persuaded that three months (only two weeks less than the time we discussed in *Wascura*) is sufficiently proximate to show causation."); *cf. Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir.1986) (fact plaintiff was discharged only one month after filing complaint with EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation").  Russell's the first  EEOC charge was filed on May 5, 2003.  The second EEOC charge was filed on April 24, 2004.  Russell was not reassigned until more than six months after the second EEOC charge (and more than a year and a half after the first EEOC charge.)  Conduct occurring  six months after the second EEOC complaint  is insufficient to create a jury issue on causation.  *Wascura, supra; Drago, supra.*

  Russell failed to prove a *prima facie* case with respect to his reassignment.

B.    Retaliatory suspension and reprimand

With respect to the suspension and the written reprimand that Russell received from Banks, Russell has several problems in establishing a *prima facie* case of retaliation.  First, Russell has made no efforts to argue how his suspension and reprimand were materially adverse.    Citing *Burlington*, Russell argues that whether he suffered tangible, adverse effects from the suspension is irrelevant.  In *Burlington*, however, the plaintiff received an indefinite suspension without pay which ultimately lasted 37 days and spanned the Christmas season and resulted  in plaintiff suffering from depression.  The court determined that the jury's conclusion that suspension was material adverse was reasonable, reasoning:

> "A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay."

*Burlington*, 126 S.Ct. at 2417.

In contrast, Russell's suspension was short (only three days) and definite in duration from the outset.

Second, Russell  has not alleged that Banks was aware that Russell had filed grievances and an EEOC complaint complaining of discrimination.   The uncontroverted evidence was that Banks was aware that Russell had  filed grievances with the City in an effort to receive the supervisor job but believed that the grievances were based on Russell's position that he was better qualified for the job.  Russell concedes aspects of the insubordination charge that led to the suspension.

Third, and most important, the proximity between the EEOC complaints and the reprimand (3 months) and the suspension (11 months)  is insufficient to create a jury issue on causation.  See

28

discussion above.    Plaintiff has failed to establish a *prima facie* case with respect to either his reprimand or suspension.

Based on the foregoing, the magistrate judge concludes that the motions for summary judgment (docs. #47 and #48) are due to be granted and that this action is due to be dismissed.  A separate final judgement consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 30th day of March, 2007.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE